ELIZABETH CHILDS AND GWENDOLYN SMITH, PLAINTIFFS,
v. ESSEX COUNTY DIVISION OF WELFARE, DEFENDANT.

Superior Court of New Jersey
Law Division Essex County

Decided August 30, 1988.

128

*Roy J. Konray,* for plaintiffs (*Konray & Kerekes,* attorneys).

*Alan C. Stephens,* for defendant (*H. Curtis Meanor,* Acting Essex County Counsel, attorney).

VILLANUEVA, J.S.C.

After welfare recipients' attorney received settlement proceeds for clients' personal injury law suits, which proceedings were concealed from the welfare agency so that no agreements to repay existed, this declaratory judgment action was commenced seeking to have the agency's claims for recoupment limited to the amount of assistance paid on behalf of plaintiffs as if their children had not been included in the eligible family unit.

Plaintiffs move for summary judgment: (1) to compel the welfare agency to recompute the amounts owed to it as if plaintiffs' children had not been included in the eligible family unit and (2) to declare that, in any event, the agency has no lien on the proceeds of plaintiffs' personal injury recoveries.

The issues are: (1) whether recoupment of assistance provided by a county welfare agency (CWA) under the Aid to Families with Dependent Children Act (AFDC), *N.J.S.A.* 44:10-1 *et seq.*, is limited to the amount of assistance received by the parent alone as if his/her children had not been included in the eligible family unit, or is it based upon the assistance to the whole eligible family unit; and (2) whether a CWA has a lien on a tort action of a welfare recipient when he/she withholds pertinent information about it and, as a result thereof, does not sign a valid agreement to repay.

The court holds that a CWA's claim for recoupment is limited to the amount of assistance paid on behalf of a parent as if his/her child had not been included in the eligible family unit. Therefore, plaintiffs must repay, from the net proceeds of their tort actions, the assistance granted to them by the CWA, regardless of whether the agency has a lien.

### *Finding of Facts Regarding Elizabeth Childs.*

Plaintiff, Elizabeth Childs, was injured in an automobile accident on January 29, 1985. Thereafter, she retained the services of the law firm of Konray and Kerekes. By complaint

dated October 25, 1985, plaintiff sued Earl Campbell and other defendants in the Superior Court of New Jersey for personal injuries.

At all times pertinent to the personal injury matter, plaintiff was a recipient of public assistance for her four dependent children (ages 5, 9, 10 & 13) under the Aid to Families with Dependent Children Act, *N.J.S.A.* 44:10–1 *et seq.*, from defendant Essex County Division of Welfare (hereinafter "agency"). Plaintiff never informed the agency that she had been in an accident, that she had retained an attorney or that she had filed a complaint for damages.

Sometime in late May 1986, the agency discovered, through a search of Essex County court records that plaintiff had filed the said action. Confronted by her caseworker with this discovery on or about June 12, 1986, plaintiff was asked to sign an agreement to repay, but she refused, upon her attorney's advice. Consequently, she was discharged from public assistance effective July 1, 1986. From the date of the accident through the date of discharge, Elizabeth Childs received assistance in the amount of $8,817, which the agency seeks to recover.

The agency claims a lien of $8,817, which is in excess of the proceeds of the settlement of her personal injury case being held in trust by her attorneys, *i.e.,* $6,146.

*Finding of Facts Regarding Gwendolyn Smith.*

Plaintiff, Gwendolyn Smith, was injured in an automobile accident on October 16, 1984. Thereafter, she retained the services of the law firm of Konray and Kerekes. By complaint dated October 2, 1986, plaintiff sued New Jersey Transit Bus Operations, Inc. in the Superior Court of New Jersey for personal injuries.

At all times pertinent to the personal injury action, plaintiff was a recipient of public assistance for her dependent son (age 14), under the aid to families with dependent children program.

The agency contends that plaintiff never informed it of the accident, that she had retained an attorney or that she had filed a complaint for damages. In late November 1986, the agency alleges that it discovered, through a search of Essex County court records, that plaintiff had filed the said action. The agency calculated the amount of assistance granted to Gwendolyn Smith from October 16, 1984 to November 14, 1986. A separate slip of paper, with the name of Konray and Kerekes shown thereon, was in the agency's records, without indicating how or when the name was obtained. It is unnecessary for the court to determine whether the agency learned of plaintiff's lawsuit from its search of court records or through notice from plaintiff's attorney. Nonetheless, the agency never requested Gwendolyn Smith to sign an agreement to repay.

Gwendolyn Smith's welfare benefits were ordered terminated August 13, 1987, because, as of December 1986, when her son was removed from her custody, she no longer had an eligible child in her household. From the date of her accident through the date of discharge from public assistance, plaintiff received public assistance in the amount of $9,816. From December 1986 through August 1987, the plaintiff received public assistance in the amount of $2,793 and food stamps in the amount of $1,170. Finally, during the month of October 1986, plaintiff had earnings of $880 from her employment with the Newark Board of Education, which she did not report to the agency. Therefore, she received $4,843, which she clearly was not entitled to receive.

The agency claims a lien of $9,816, which is in excess of the gross amount of the settlement of $9,330 that Gwendolyn Smith received for her personal injury case, which includes an unpaid lien of her treating doctor in the amount of $2,330.

### Eligibility for Aid to Dependent Children & Agency's Right to Recoup the Assistance Granted.

Under the AFDC, adopted in New Jersey in 1959, *N.J.S.A.* 44:10–1 *et seq.*, the county welfare boards administer the pro-

gram subject to the supervision of the Department of Human Services (formerly the Department of Institutions and Agencies), which has adopted general policies, rules and regulations for carrying out the purposes of the act. *Redding v. Burlington Cty. Welfare Bd.*, 65 *N.J.* 439, 442 (1974).

Eligible dependent children and the parent or parents or relative with whom they are living are entitled to financial assistance and other services from the county welfare agency (CWA) of the county in which they reside. *N.J.S.A.* 44:10–2. Each CWA charged with the administration of the AFDC program has the duty to take into consideration all of the income and resources of the dependent child and of the parent, parents, or other relatives with whom the child is living when determining eligibility for financial assistance. *N.J.S.A.* 44:10–3. Similarly, welfare recipients have the duty in their initial applications, as well as in subsequent recertifications for continuing eligibility, to keep the agency abreast of changes in household members, income, resources, potential resources, or anything which may affect eligibility. *N.J.A.C.* 10:81–5.1. Such information must be recorded on the application for public assistance. *N.J.A.C.* 10:81–3.6.

Welfare applicants and recipients are in all instances the primary source of information about themselves and their families; hence, a certain degree of a client's candor must accompany each application or recertification. Since it is the responsibility of the agency to determine eligibility and to secure verification from secondary sources, applicants and recipients must help select the most likely sources for corroboration of essential eligibility information. If the applicant is unwilling to make the necessary inquiries or to secure the required information from such sources themselves, the CWA cannot grant assistance. *N.J.A.C.* 10:81–1.5, –3.3. The agency is required to determine from the applicant whether there is a pending claim against any individual, group or agency on behalf of any member of the eligible unit. If such a non-exempt claim exists,

the applicant is required to execute an agreement to repay before a welfare grant may be given. *N.J.A.C.* 10:81–2.12.

The statute creating the repayment obligation of a welfare recipient states, in pertinent part:

Whenever any parent or relative with whom a child is living applies for or is receiving assistance for such child pursuant to this act, and it appears that there is pending entitlement to a payment to the child or to either or both his parents of funds arising from a claim or interest legally or equitably owned by such child or by either or both his parents, other than that portion of a personal injury award which a court specifically awards to a child to make him whole as a result of an injury, the county welfare agency may, as a condition of eligibility or continuation of eligibility for such assistance, require such parent or parents, or relative, to execute a written promise to repay, from the funds anticipated, the amount of assistance to be granted from the date of entitlement to such payment. Upon any refusal to make repayment, including refusal by any person acting for or on behalf of such parent or parents, or relative, in accordance with such promise, the county welfare agency may take all necessary and proper action under the laws of this state to enforce such promise, and the granting or continuing of assistance, as the case may be, shall be deemed due consideration therefor.... [*N.J.S.A.* 44:10–4(a)]

Under *N.J.S.A.* 44:10–4(a), parents or relatives who, like plaintiffs herein, receive public assistance for children living with them, may be required, as a condition of their continued eligibility, to agree to repay, from the settlement of certain legal claims or interests, the assistance granted by the county welfare agency from the date of their entitlement to such claims or interest. However, this provision does not preclude the recovery of such funds in the absence of an agreement to repay.

*N.J.A.C.* 10:81–3.41(e) specifies the circumstances whereby recovery may be had from a welfare recipient in the absence of an agreement to repay. Those circumstances include: (1) where an agreement to repay does not exist solely because of the applicant/client's withholding of information; or (2) any instance in which an agreement to repay would have been applicable but closure of the case precluded delivery of the agreement. When a client has received payments that, for any reason other than the client's withholding of information, are not covered by a repayment agreement, the CWA cannot pur-

sue a claim for repayment, but can reevaluate a client's current eligibility. *N.J.A.C.* 10:81–3.41(e)3. In this case, the agency contends that plaintiffs continually refused to cooperate and to notify it promptly of the resource.

The Department of Human Services, which has the greater financial and administrative interest in the AFDC program[1], agrees that, in the absence of "peculiar facts," the above is the correct interpretation of its regulation.

### Plaintiff Elizabeth Childs' Case.

In the case of plaintiff, Elizabeth Childs, the agency was unable to determine if a pending claim existed, at least until it discovered the litigation through its own efforts 16 months later. On plaintiff's reapplication for public assistance, dated November 20, 1985, item 35 asks: "Do You or Anyone Making Application Have Any Pending Claims, Such as Lawsuits, Divorce Settlement, Inheritance, Accident Claim, Sale of Property or Does Anyone Owe You Money?" In the space directly underneath this question, plaintiff checked "No," notwithstanding that her complaint had been filed one month earlier. In addition, another paragraph states: "I (we) agree to let the County Welfare Agency know immediately of any change in living conditions, family situation or money received from any source." (See *Your Rights and Responsibilities;* emphasis in original).

Finally, just above plaintiff's signature reads: "I (we) *Elizabeth Childs* attest that I (we) have read and agree to these statements and fully realize that the County Welfare Agency relies upon the truth and accuracy of my (our) statements."

■ Unquestionably, plaintiff withheld the information until confronted by the agency in June 1986, at which time the agency asked her to sign an agreement to repay. When

[1]Benefits are paid one-half by the federal government, three-eighths by the State, and one-eighth by the county.

plaintiff refused, she was appropriately discharged from assistance. *N.J.A.C.* 10:81–3.41 governs a situation where a welfare recipient withholds information about potential sources of money available to the recipient and permits recovery of welfare funds in the absence of an agreement to repay. It states, in pertinent part:

(e) Rules when valid Agreement to Repay does not exist are:

1. Upon liquidation of a resource for which a valid Agreement to Repay does not exist solely by reason of the applicant/client's withholding of information about the matter, the CWA shall pursue collection activity as in this section, indicating to those concerned including the courts, that except for the client's withholding of information, a valid agreement would have existed or the assistance would not have been granted.

The essential facts of the case regarding Elizabeth Childs are similar to the case of *Terry v. Harris,* 175 *N.J.Super.* 482 (Law Div.1980), where, as here, a welfare recipient withheld pertinent information about a resource from the agency. In construing the above-cited regulation, this court held:

In order to treat a situation where no agreement has been signed by a welfare recipient to repay welfare funds as if such an agreement, in fact, did exist, it must be shown that the recipient withheld information regarding other sources of money available to the recipient and, as a result thereof, a valid agreement would have existed or assistance would not have been granted. [at 494–495]

This court held that in light of the client's withholding of information, the agency, pursuant to the regulation, could recover the welfare funds expended while the client's claim was pending. Similarly, Elizabeth Childs also withheld the pertinent information, and when she refused to execute an agreement to repay, her assistance was terminated due to her refusal to cooperate. The agency's action in terminating assistance satisfies all criteria allowing recovery pursuant to the regulation.

The agency's claim relates back to the date of the accident giving rise to the potential resource. *Brinkley v. LaRoche,* 178 *N.J.Super.* 243 (App.Div.1981); *Reed v. Slaughter,* 110 *N.J.* 480, 488 (1988) (Handler, J., dissenting); *N.J.A.C.* 10:81–3.41(a).

### *Plaintiff Gwendolyn Smith's Case.*

■ Plaintiff, Gwendolyn Smith also withheld information about her pending accident claim. In the application for public

assistance, dated October 8, 1986, Gwendolyn Smith was asked: "Does anyone in the applicant household have any pending claims such as lawsuits, divorce settlements, inheritance, accident claims, sale of property or other claims or does anyone owe you money? YES NO EXPLAIN:" In the space below, plaintiff indicated "None," notwithstanding that her complaint had been filed on October 2, 1986. Similarly, on a subsequent reapplication for assistance dated March 23, 1987, the same question was asked of plaintiff and again she answered in the negative.

The agency discovered the lawsuit through its own efforts in November 1986, but plaintiff continued to remain on public assistance until August 11, 1987. Inexplicably, no agreement to repay exists. There is no proof that plaintiff was ever requested to execute an agreement to repay. Since, however, she withheld the information from her caseworker on two occasions, and continued to receive benefits until later, when in an administrative hearing, she was determined to be ineligible, she should not benefit, even though the agency did not request the agreement after she was otherwise ineligible. Plaintiff was ineligible for public assistance from December 1986 through August 1987, and federal and state law requires that welfare benefits and food stamp coupons issued improperly be reimbursed.

█ In an administrative hearing in the Office of Administrative Law on July 22, 1987, Gwendolyn Smith was determined to be ineligible for public assistance as she no longer had an eligible child in her household as of December 1986. The period of ineligibility is retroactive to December 1986, notwithstanding that plaintiff continued to receive public assistance while the administrative proceeding was pending.[2]

---

2 *N.J.A.C.* 10:81–6.3(b) permits welfare recipients to continue to receive benefits while a matter is pending with a caveat that if they opt for continued

In addition, Gwendolyn Smith's son, Charles Smith was not only being cared for by Smith's sister as of February 24, 1987, but the sister also began receiving assistance for the same individual, Charles Smith, beginning June 1, 1987. What occurred then, from June 1, 1987 through August 1987, was a duplication of public assistance, which is strictly forbidden. *N.J.A.C.* 10:81–1.10. Despite the fact that since December 1986, Gwendolyn Smith no longer exercised any physical custody or care for her child, she continued to apply for public assistance for that child, as evidenced by her March 13, 1987 application.

As Gwendolyn Smith did not have a "needy" or "eligible" child residing with her as defined by 42 *U.S.C.A.* § 601 *et seq.*, *N.J.S.A.* 44:10–1 *et seq.*, and administrative regulations which specifically define the AFDC eligible family unit, *N.J.A.C.* 10:81–3.8, –3.9, 10:82–1.3, –1.4, there was no eligibility for public assistance under the AFDC program as of December 1986. Accordingly, she was overpaid $2,793. The provision requiring the monies to be recovered by a CWA is *N.J.A.C.* 10:82–2.19. Subsection (a) reads:

*Overpayments:* Overpayment means a financial assistance payment received by or for an eligible unit for the payment month which exceeds the amount for which that unit was eligible. Upon discovery of an overpayment, the CWA shall take all reasonable steps necessary to promptly correct any overpayment as outlined in (a) of this section. The CWA shall seek recovery of all overpayments regardless of fault, including overpayment caused by administrative action or inaction and overpayments resulting from assistance paid pending hearing decisions.

1. Determine the amount of overpayment:

i. The amount of overpayment shall be the amount of assistance received during the period of overpayment less the amount of assistance which should have been received.

Subsections (4) and (8) define how the recovery is to be accomplished:

---

benefits, they will have to reimburse the agency should they ultimately fail on the merits.

4. Recovery may be accomplished by securing repayment from the existing *income and resources of the eligible unit,* by reducing the assistance payable to the eligible unit, by suspending assistance to an eligible unit subject to monthly reporting, or by securing repayment through court action, if necessary.

. . . .

8. Overpayments to an eligible unit, *all members of which are no longer receiving AFDC,* shall be recovered by the CWA through a court of appropriate jurisdiction if the family does not voluntarily repay the overpayment.... [Emphasis supplied]

The above-cited subsections require the CWA to pursue collection through the courts, and the appropriate construction of subsection (4) allows the CWA to seek recovery of the overpayments from a plaintiff's personal injury settlement.

The agency also discovered that Gwendolyn Smith had worked during the month of October 1986 and failed to report those earnings to it. In the case of timely reporting of earned income a client normally would be entitled to have a certain portion of that income disregarded and, therefore, not budgeted for purposes of calculating the amount of the monthly assistance grant. *N.J.S.A.* 10:82–4.4. However, where the client either fails to report or makes no timely reporting of earned income from employment, he/she is not entitled to have any income disregarded in the case of an overpayment. *N.J.A.C.* 10:82–2.19(a)1i(1), –4.4. Without the benefit of any disregarded income, the entire amount of income for the month of October 1986, *i.e.,* $880, is recoverable.

Each and every eligible AFDC assistance household is granted an allotment of food stamps issued by the United States Department of Agriculture pursuant to 7 *U.S.C.A.,* § 2001 *et seq.* Agency records reveal that Smith's allotment for the period of December 1986 through August 1987 was $117 a month. Since she had a change in her household membership rendering her ineligible for AFDC assistance, Smith was likewise ineligible for food stamps or otherwise eligible at a reduced amount.

If there is a change in household composition, a CWA must seek reimbursement for an overissuance of food coupons.

(a) If a change in household membership occurs, the CWA shall initiate collection action against any or all of the adult members of a household at the time an overissuance occurred. If a change in household composition occurs, CWAs may pursue collection action against any household which has a member who was an adult member of the household that received the overissuance. The CWA may also offset the amount of the claim against restored benefits owed to any household which contains a member who was an adult member of the original household at the time the overissuance occurred. Under no circumstances shall the CWA collect more than the amount of the claim. [*N.J.A.C.* 10:87–11.28]

Further, *N.J.A.C.* 10:87–11.2 states:

(a) For purposes of determining whether or not a person has committed an intentional program violation, intentional program violations shall consist of having intentionally:

1. Made a false or misleading statement or misrepresented, concealed or withheld facts....

As Gwendolyn Smith withheld information about the change in her household, *N.J.A.C.* 10:87–11.2, thereby rendering her ineligible for food coupons or eligible for a reduced amount, the remaining amounts owed must be repaid.[3]

 CWA has no discretion whatsoever with regard to seeking recovery of overpayments of public assistance funds or overissuances of food coupons. The foregoing recovery provisions are mandatory. Under the AFDC program, federal financial participation can be jeopardized for failure of states diligently to seek recovery of monies paid out in excess of what is mandated. 45 *C.F.R.* § 205. Similarly, under the totally federally-funded food stamp program, states are subject to severe sanctions, not merely state reduction of participation in the program, but state liability for overissuance of coupons, should a state fail to recover or make good faith efforts to recover. 7 *C.F.R.* §§ 275, 276. The court is mindful of the severe sanc-

---

[3]Since figures have not been supplied to the court, entitlement for any reduced amounts will be determined at a further hearing. Gwendolyn Smith shall file an affidavit by September 14, 1988, indicating the amount that this item should be reduced.

tions contained in the penalty section of the AFDC application, of which a welfare client is given notice, in the event of failure to report changes in his/her household or otherwise conceals facts from the agency.

As the agency is obligated to seek recovery of overpayments of AFDC assistance and food stamp coupons, plaintiff is liable for said overpayments.

### *The Agency Must Recompute its Claims Limited to the Assistance Given for Plaintiffs Alone Plus Money Illegally Obtained.*

■ Relying on *N.J.A.C.* 10:81–3.41, plaintiffs assert that the agency has incorrectly calculated the assistance owed to it. This regulation states, in pertinent part:

(a) *Valid agreement to repay exists:* Upon liquidation of a resource for which a valid Agreement to Repay exists, regardless of whether or not the persons involved are receiving assistance at the time, the CWA will evaluate the situation. Upon a showing that, by release of the funds and only by release of the funds, the household can remain off the assistance rolls indefinitely, the CWA may, with the approval of the State office, release the funds to the household. In all other instances the CWA will, subject to the special provisions below, pursue recovery of the lesser of the following amounts:

1. The amount of cash assistance granted in the AFDC program to or for the person(s) for whom the pending matter was applicable from the date of the accident or occurrence which gave rise to the settlement to the date of payment, regardless of the date of execution of the Agreement to Repay. . . .

*N.J.A.C.* 10:81–3.41(2)i adds:

The amount of assistance paid on behalf of an *individual* shall be the difference between the actual grant(s) received and the amount which would have been granted to the family if the child had not been included in the eligible unit. [emphasis supplied]

Plaintiffs contend that the above-quoted regulations should be construed to limit the agency's claim to the amount of funds paid on behalf of the recipient and not the funds received by the recipient for the benefit of the recipient's dependents. This interpretation is based upon the suggestion that had the regulation intended to cover only the situation where a child settles his case, then it would have been easy enough to do so simply by substituting the word "child" for the word "individual."

Admittedly, the language is ambiguous. The agency relies upon the language contained in an agreement to repay, prepared prior to case law and adoption of the regulation, as well as a recent interpretation of the regulation by the agency charged with the administration of the AFDC and which promulgated the subject rule, which held that the entire welfare grant is subject to recovery where the pending resource is applicable to a person legally responsible for the support of other persons eligible for and receiving assistance. The agreement to repay states what is to be repaid while the recipient awaits the liquidation of a claim or interest.

> ... I understand that this law requires me to repay some or all of the welfare I and/or the other family members receive while waiting for money from a lawsuit, claim or interest. Because of a certain claim, lawsuit or interest arising out of (describe circumstances) there may be a sum of money coming to (*"me" or name of person*). If I receive that sum, I agree to repay the welfare I received to the county welfare agency. *The amount to be repaid will equal the welfare paid for the persons for whose support that person is responsible....* [Emphasis supplied]

A policy letter issued June 30, 1988 to the acting county counsel of Essex County by the chief of the bureau of local operations, Department of Human Services, Division of Public Welfare, while admitting the ambiguity of the regulation, embraces the language in the agreement to repay when it states:

> This is in reply to your letter of June 16, 1988 concerning the intended construction of PAM 10:81-3.41(a)2i in regard to calculation of the amount of recovery.
>
> While we agree that the language in PAM 10:31-3.4(a)2i is ambiguous, it is not to be construed to mean that the amount subject to recovery should be reduced by the child's(ren) share of the assistance funds expended.
>
> The intent of the recovery calculation methodology is, I believe, contained in the Agreement to Repay (PA-10D), wherein it clearly states that by signing the PA-10D the client will be required to "... repay some or all of the welfare [he/she] and/or the other family members receive ..." and that "... the amount to be repaid will equal the welfare paid for the persons for whose support that person is responsible."

The policy letter is the official agency interpretation of the regulation, and each CWA must adhere to its command. The practical interpretation of a statute (or regulation) by the agency which must enforce its provision is a legitimate source

of legislative intent. *State v. Resorts International*, 173 *N.J. Super.* 290 (App.Div.1980), *Falgiatore v. Atlantic County Board of Social Services*, 175 *N.J.Super.* 122 (Ch.Div.1980).

A state agency's interpretation of its own regulations is entitled to considerable deference, but a court need not accept the agency's interpretation if it is plainly erroneous or inconsistent with the regulation. *Harris v. Harris*, 749 *F.*2d 1009 (3 Cir.1984). *Presinzano v. Hoffman–LaRoche, Inc.*, 726 *F.*2d 105 (3 Cir.1984). In this case, the agency's interpretation does not reflect the intent of *N.J.A.C.* 10:81–3.41(a)2i, nor the purpose of aid to dependent children. It also would change the meaning of the word "individual" to mean "child," when the Legislature did not choose to do so. I am bound by the word it deliberately used.

The only reported opinion on this issue is one made by an administrative law judge. *Mercer County Welfare Board v. Z.T.*, 1 *N.J.A.R.* 158 (Off. of Admin.Law 1980). Plaintiff made a similar challenge to *N.J.A.C.* 10:81–3.41, alleging that, since the accident claim was solely for the adult recipient, the amount of assistance received for her children should be excluded from repayment. This argument was rejected by the administrative law judge when he stated:

> ... Secondly, form PA–10D states that in accordance with *N.J.S.A.* Title 44, Chapter 10, assistance granted will be repaid. *No distinction is made between assistance given to the parent and assistance given to the child.* [*Id.* at 160; emphasis supplied]

The court notes that this decision by an administrative law judge predated the enactment of the critical section of *N.J.A.C.* 10:81–3.41(a)2i. In addition, this court disagrees with its reasoning and result.

Even if a valid repayment agreement exists, *N.J.A.C.* 10:81–3.41 establishes the amount to be repaid. Recovery shall be the lesser of either: "(1) The amount of cash assistance granted in the AFDC program to or for the person(s) for whom the pending matter was applicable"; or "(2) The amount of money actually received after making ... allowances...." Subpara-

graph (a)1 is applicable where the recipient receives an award larger than her grant. In such case, she is required to repay only the amount of assistance she actually received in her grant. Subparagraph (a)2 is applicable where the award is less than the amount of assistance she received in her grant. In such case, she is required to repay only the amount she received in the award.

Subparagraph (a)1 requires repayment of the cash assistance granted *"to or for the person(s) for whom the pending matter was applicable."* Emphasis supplied. This limits the agency's recovery to the amount of the grant received by the parent for the parent. Subparagraph (a)2i further defines the amount of assistance paid on behalf of an individual as "the difference between the actual grant(s) received and the amount which would have been granted to the family if the child had not been included in the eligible unit." If the CWB may recover only the grant paid "for the person(s) for whom the pending matter was applicable," and the amount of that assistance paid on behalf of that person (the parents) is "the difference between the actual grant(s) received and the amount which would have been granted to the family if the child had not been included in the eligible unit," then the amount of the grant which is subject to repayment is the parent's portion of the grant.[4] This interpretation is in accord with the Legislature's intent to protect and provide for children, while requiring adults who receive awards for their own injuries to repay assistance grants, and thus, not benefit from their injuries at public expense.

Although there are no New Jersey cases on point, there are several similar New York cases.

---

[4] If there had not been a child, then neither plaintiff would have been entitled to a grant. The only way to give effect to the regulation is to read it as requiring the child's portion of the grant to be deducted from the total grant, with the remaining portion being subject to recovery. To read this subparagraph otherwise would make the regulation a nullity.

In a personal injury action by a passenger injured in a bus accident, the court in *Moore v. Nassau County Dept. of Pub. Transp.*, 78 *Misc.*2d 1066, 357 *N.Y.S.*2d 652 (Sup.Ct.1974), approved a stipulation of the parties (leaving only the amount thereof for disposition) that the state social services department could assert a lien against the passenger's settlement in order to recover AFDC benefits granted to the passenger herself since the accident, but not to recover for AFDC assistance granted to other family members and, noting a split in the case law, adopted as more enlightened the view that an assistance lien which cuts down a person's ultimate personal injury recovery should not include amounts for aid furnished to others, even if related by blood or marriage. Accordingly, the court approved a division of the AFDC lien which reflected reimbursement only of benefits received by the passenger herself.

In another case, the court in *Borsman v. Mannix*, 46 *A.D.*2d 885, 361 *N.Y.S.*2d 694 (1974), held that a mother of six children who was injured in an automobile accident was not, within the meaning of the state lien statute, a recipient of AFDC benefits given to her for her children, but a recipient only for the amount of such benefits paid for her own assistance and care, so that the department could recover only for assistance paid to the mother for her sole benefit. The AFDC money, the court observed, was not for the mother's support but for the maintenance and care of her children, the mother serving only as the conduit through which its application to the children was administered. The court reasoned that while recovery by the department of assistance payments to a recipient injured in an accident was not limited by the statute to assistance resulting directly from the accident, the absence of such a limitation did not thereby enlarge the definition of "assistance" to include monies paid for the welfare of anyone besides the injured recipient.

Noting that the mother would not have received the benefits had there been no eligible children in her household, that she would have been subject to penal sanctions if she had diverted any part of the allowance granted for the children to her own

use, and that her conduct could not be used as a gauge to reduce or eliminate the benefits to which the children were entitled, the court further held that funds paid to her to compensate her for personal injuries did not provide the kind of funds that should be tapped to reimburse the department for monies paid to support and care for needy, dependent children.

The court held that the department could recover the amount of money for assistance and care paid to the mother for her sole benefit, but not the money paid for the children, and remitted the motion for a hearing and determination of the amount of money for assistance paid to the mother for her sole benefit.

Similarly, in *Miller v. Smythe,* 79 *Misc.*2d 945, 361 *N.Y.S.*2d 804 (Sup.Ct.1974), a proceeding challenging the amount of a lien asserted by the Department of Social Services against the proceeds of an AFDC recipient's pending personal injury action, the court held that the department could recapture only that proportion of assistance which had been furnished for the direct use of the recipient mother and could not include sums furnished under the program for support of three minor children, since under the aid to dependent children program, the parent is merely a custodian of funds which are to be used solely for the benefit of the child. The court rejected the department's contention that the mother's legal responsibility for her children provided a basis for asserting a lien for the amount of assistance rendered to both the mother and her children, holding that where a personal injury claim is involved, the department's right to recover was limited by the lien statute to aid directly given to a tort claimant who was the recipient of public assistance.

The object of the AFDC program is to provide aid to dependent children. Eligibility for aid is predicated on the interests of the child. Although the parent initially receives the grant, the parent is merely a custodian of funds which are to be used only for the benefit of the child. If the parent willfully misuses the allowance, the parent can be found guilty of a crime. Obvious-

ly, public assistance furnished to petitioner for the sole benefit of petitioner's children is qualitatively different from the assistance furnished to her and, therefore, is not subject to recoupment. *Id.* 361 *A.*2d at 806.

These New York cases also reflect the intent of *N.J.A.C.* 10:81–3.41(a)2i.

It should be noted that, with respect to recoupment, the New York Social Services Act, § 104–b(1), mentions "recipient of public assistance" and our act refers to "amount of assistance paid on behalf of an individual."

■ To permit assistance money to be paid out in excess of that permitted by law would damage and destroy the AFDC program and permit a willful or an unintentional wrongdoer to receive payments not authorized by law. In the instant case, due to the failure of plaintiffs to inform the agency of the pending lawsuits and possible payments to them, the agency was unable to comply with the statute and require the parent to execute an agreement to repay. The refusal of Elizabeth Childs to sign the agreement to repay was contrary to the mandate of *N.J.S.A.* 44:10–4(a) and the regulations of the State Division of Public Welfare.

Unlike *Reed v. Slaughter,* 110 *N.J.* 480 (1988), this case does not involve an administrative oversight of a welfare agency that failed to obtain a written agreement to repay AFDC benefits from a pending tort claim (except for a part of November 1986 in the case of Gwendolyn Smith). It is irrelevant whether a welfare recipient refuses to sign a written agreement to repay (as in the Childs case) or receives assistance through continued misrepresentations as to her resources without a request from the welfare agency to obtain a repayment agreement (as in the Smith case). The welfare agency could not seek an agreement to repay unless it knew the source from which it would be reimbursed. Gwendolyn Smith was also ineligible to receive assistance from December 1986, when her

son was removed from the household, although the agency learned of her lawsuit only a week or two earlier.

Plaintiffs, by withholding information from the agency and thus preventing it from obtaining agreements to repay pending claims due plaintiffs caused an improper payment of public assistance, contrary to law and regulations of the State of New Jersey charged with the administration of the AFDC program.

In light of the foregoing statute and regulations implementing same, there is no logical reason to excuse a welfare recipient who refuses, willfully or otherwise, to disclose a pending lawsuit, from having to repay welfare assistance, whereas those welfare recipients who comply with the spirit and intent of the AFDC program are penalized because, when they do so, they are required to sign an agreement to repay or their assistance is terminated. *Terry v. Harris, supra,* 175 *N.J.Super.* at 498.

Since plaintiffs withheld pertinent information about a pending resource from defendant, the agency may recoup the assistance granted.

Therefore, Elizabeth Childs owes the agency for the welfare assistance granted to her and for her alone from January 29, 1985 to July 1, 1986. Gwendolyn Smith owes the agency for the welfare assistance granted to her and for her alone from October 16, 1984 to August 31, 1987, plus $880 for her earnings in October 1986 and the amount of food coupons [5] that she obtained illegally.

## *Plaintiffs Must Turn Over Their Tort Action Proceeds to the Agency.*

Plaintiffs contend that, in the absence of an executed agreement to repay, the agency does not have a lien upon their

---

[5]The amount owed may be less, depending upon whether the amount for recoupment of food coupons should be reduced—as indicated in an earlier footnote.

tort actions, regardless of whether plaintiffs have a duty to repay welfare assistance.

Nothing in the statute (*N.J.S.A.* 44:10–4) creates a lien upon funds of a welfare recipient. Likewise, nothing in the rules and regulations addresses whether there is a lien. Plaintiffs contend that if the Legislature had intended to allow welfare liens, it would have done so as it did in the Medicaid provisions (*N.J.S.A.* 30:4D–7.1).

Some states, however, have created a statutory lien. See Title 6 of New York Social Services Law, § 104–b.

Since this is a declaratory action and all parties claiming an interest in the fund must be joined, *N.J.S.A.* 2A:16–56, the court need not determine whether the agency has an equitable lien since the only interested parties, plaintiffs and defendant, are before the court.

This action is more in the nature of interpleader except the stakeholder herein (plaintiffs' attorney) has a further obligation—to prevent his clients from defrauding the agency, R.P.C. 1.6., and could be personally liable if he breached this obligation. This is obviously why he brought this action. He was aware of the welfare claims or liens because he told Elizabeth Childs *not* to sign an agreement to repay on June 12, 1986 and was in contact with the agency about Gwendolyn Smith's welfare assistance in November 1986.

The administrative code provision designed to implement *N.J. S.A.* 44:10–4(a), relied upon by the agency, permits a welfare agency to pursue collection activity by indicating to those concerned, including the courts, "that except for the client's withholding of information, a valid agreement would have existed or the assistance would not have been granted." *N.J.A.C.* 10:81–3.41(e)(1).

Plaintiffs, by withholding information from the agency about pending payments to them, prevented the agency from obtaining an executed agreement to repay from the funds anticipated, not only resulting in an improper payment of public assistance

but also causing an unjust enrichment to plaintiffs because of their misrepresentations. The court finds that, but for such misrepresentations, a valid agreement to repay would have existed or assistance would not have been granted.

The real question is whether a welfare recipient who withholds from the welfare agency, before and while receiving welfare assistance, pertinent information about a pending tort action, thereby not being requested to sign an agreement to repay, can retain the proceeds of the tort action and not turn them over to the welfare agency, which would have been entitled to them had he/she signed the agreement. The answer is that in equity and good conscience he/she should not be permitted to do so.

Plaintiffs have frustrated the underlying *raison d'etre* of agreements to repay, which is the restitution of public money paid to welfare recipients.

The purpose of the statute (*N.J.S.A.* 44:10–4) creating the repayment obligation of a welfare recipient is to require a person, supported by welfare monies, during a time of anticipated but unrealized income, to treat the assistance monies as a loan which must be repaid when the income is realized. The arrangement satisfies the need of the welfare recipient while protecting the public treasury. *Falgiatore v. Atlantic County Board of Social Services, supra,* 175 *N.J.Super.* at 126. Equity regards that as done which ought to be done. 30 *C.J.S., Equity,* § 106. The court will treat the situation as if a valid agreement to repay exists, just as *N.J.A.C.* 10:81–3.41(e)(1) states.

Therefore, plaintiffs must repay (the assistance they received for themselves and the other illegally-obtained funds) the agency from the net proceeds [6] of their tort actions being held by

---

[6]Since the agency's claims against Gwendolyn Smith, in any event, cannot be fully satisfied from the net proceeds available, the welfare assistance shall be

their attorney. This will result in the disgorging of their illegally-obtained welfare assistance.

The agency shall recompute the amount of its claims.

repaid first and Gwendolyn Smith shall remain liable for the other money illegally obtained.